UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| THO VAN HA, | ) | Case No. 13cv1211-LAB (BLM) |
| Plaintiff, | ) ) | **REPORT AND RECOMMENDATION** |
| v. | ) ) | **FOR ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY** |
| CAROLYN W. COLVIN, | ) ) | **JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR** |
| Acting Commissioner of Social Security, | ) ) | **SUMMARY JUDGMENT** |
| Defendant. | ) ) | [ECF Nos. 35-39] |
| | ) | |

Plaintiff Tho Van Ha brought this action for judicial review of the Social Security Commissioner's ("Commissioner") denial of his claim for social security disability benefits.  See ECF No. 1.  Before the Court are Plaintiff's Motion for Summary Judgment  (ECF No. 35-1, "Pl.'s Mot."), Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment (ECF No. 36-1 & 37-1 "Def.'s Mot."),[1] Plaintiff's Reply in support of his motion (ECF No. 38 "Pl.'s Reply."), and Defendant's Reply in Support of Cross-Motion for Summary Judgment (ECF No. 39 "Def.'s Reply").

This Report and Recommendation is submitted to United States District Judge Larry A. Burns pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California.  For the reasons set forth below, this Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Cross-Motion for Summary Judgment be **GRANTED.**

---

[1] Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment appear on the docket as two documents.  See ECF Nos. 36 & 37.  However, the content of the documents is the same.  See id.  For clarity, the Court will refer to Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment as one document, namely, "Def.'s Mot."

**PROCEDURAL BACKGROUND**

On December 21, 2009, Plaintiff filed a Title XVI Supplemental Security Income benefits ("SSI") application, alleging disability beginning on January 1, 2002. See Administrative Record ("AR") at 137-43.  The claim was initially denied on April 16, 2010, and upon reconsideration on July 22, 2010, resulting in Plaintiff's request for an administrative hearing on August 3, 2010. Id. at 48-51, 55-59, 61.

On September 23, 2011, a hearing was held before Administrative Law Judge ("ALJ") Eve B. Godfrey. Id. at 26.  During the hearing, Plaintiff amended his alleged onset of disability date to December 21, 2009. Id. at 15, 31.  In a written decision dated December 5, 2011, ALJ Godfrey determined that Plaintiff was not disabled under section 1614(a)(3)(A) of the Social Security Act. Id. at 15, 21.  Plaintiff then requested review by the Appeals Council. See id.  In a letter dated March 19, 2013, the Appeals Council found no basis to review the ALJ's ruling, and the ALJ's decision therefore became the Commissioner's final decision. Id.

On May 21, 2013, Plaintiff filed the instant action seeking judicial review by the federal district court. See ECF No. 1.  On December 5, 2014, Plaintiff filed a motion for summary judgment alleging the following errors: 1) the ALJ erred in finding that Plaintiff had non-severe impairments or combination of impairments at Step Two of the sequential evaluation and improperly evaluated his testimony, 2) the ALJ erred by disregarding the opinions of Plaintiff's treating physicians, and 3) the Appeals Council erred by refusing to consider the evidence submitted by Plaintiff in connection with his request for review. Pl.'s Mot. at 2-25.  Defendant filed a timely Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment asserting that the ALJ's final decision is supported by substantial evidence, is free of harmful error, and should be affirmed. Def.'s Mot. at 5.  On December 15, 2014, Plaintiff filed a Reply in support of his motion, and on December 31, 2014, Defendant filed a Reply in Support of Cross-Motion for Summary Judgment. See Pl.'s Reply and Def.'s Reply.

**ALJ's DECISION**

On December 5, 2011, the ALJ issued a written decision in which she determined that Plaintiff was not disabled as defined in the Social Security Act.  AR at 15-21.  Initially, the ALJ

determined that Plaintiff had not engaged in substantial gainful activity during the relevant time period (since December 21, 2009). Id. at 17. The ALJ noted that Plaintiff, who had not worked since 1992, had "a very poor work record long before" he allegedly became unable to work, and that Plaintiff's "failure to work for years when he could have done so reflect[ed] poorly on his motivation for gainful employment regardless of any alleged limitations." Id. at 20. The ALJ also concluded that Plaintiff had the following medically determinable impairments: "atypical left sided facial pain and headaches; trigeminal neuralgia,[2] status post trigeminal neuralgia surgery; mild bursitis of the tibial tubercles bilaterally; hearing loss; minimal degenerative changes of the cervical spine; and hypertension." Id. at 17. She then determined that Plaintiff "d[id] not have a severe impairment or combination of impairments," as defined in the Regulations, because Plaintiff's impairment or combination of impairments did not impose a significant limitation on his ability to work for the required 12-month period. Id. The ALJ noted that although Plaintiff's medically determinable impairments "could reasonably be expected to produce the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not fully credible." Id. at 18. She stated that the record showed that Plaintiff's surgery and subsequent physical therapies were successful, which did not support a finding of a severe impairment or combination of impairments. Id. The ALJ concluded that the objective medical evidence did not support Plaintiff's "allegations of a disabling physical impairment, combination of impairments or pain symptoms." Id. at 19. The ALJ further explained that in reaching her decision, she "g[ave] substantial weight" to the opinions by Drs. Jacobs, Haaland, Sabourin and Janese, and relied on Plaintiff's history of effective medical treatments and objective medical evidence. Id. at 21.

In making her findings, the ALJ considered medical records from the University of California, San Diego ("UCSD") Medical Center indicating that Plaintiff had developed left-sided

---

[2] "Trigeminal neuralgia (TN), also called *tic douloureux*, is a chronic pain condition that causes extreme, sporadic, sudden burning or shock-like face pain. The pain seldom lasts more than a few seconds or a minute or two per episode." National Institute of Neurological Disorders and Stroke, Trigeminal Neuralgia Information Page, last updated Feb. 23, 2015, http://www.ninds.nih.gov/disorders/trigeminal_neuralgia/trigeminal_neuralgia.htm (last visited May 26, 2015).

1   head pain and was diagnosed with trigeminal neuralgia several years before.  Id. at 18.  The ALJ

2   noted that the diagnosis for trigeminal neuralgia was confirmed by Plaintiff's MRI scan which

3   showed a "definite vessel in contact with the left trigeminal nerve," for which Plaintiff underwent

4   a left retromastoid craniectomy with microvascular decompression of the left trigeminal nerve in

5   May 2009.  Id.  The ALJ observed that postoperatively, Plaintiff reported to his neurosurgeon Dr.

6   Alksne that he was "pain free," had none of his preoperative tic pain, but had numbness in his

7   left jaw and diminished sensation in his left lower face and tongue, and that Dr. Alksne opined

8   that Plaintiff's headaches were secondary to occipital neuralgia[3] and not his trigeminal neuralgia.

9   Id. at 19.  The ALJ further stated that Plaintiff's diagnostic imaging did not reveal any significant

10  musculoskeletal or neurological problem, as evidenced by Plaintiff's May 2008 cervical spine MRI,

11  which showed only some minimal bulges without cord or root impingement, and Plaintiff's March

12  2010 EMG/nerve conduction study, which was normal without evidence of polyneuropathy in his

13  lower extremities, lumbar radiculopathy, or tibial or peroneal mononeuropathy.  Id.

14      The ALJ also reviewed postoperative medical records from Plaintiff's treating physician Dr.

15  Pham, indicating that Plaintiff had a hearing impairment, facial numbness and weakness, head

16  and neck pain, tenderness, and headache.  Id.  The ALJ observed that Dr. Pham frequently asked

17  Plaintiff to return only on an as needed basis, which the ALJ interpreted as "suggesting no need

18  for regular and continuing treatment of any medical problem."  Id.  The ALJ also noted that in

19  October 2010, Plaintiff complained to his neurosurgeon Dr. Alksne of left occipital headache and

20  numbness in his face and tongue, but reported no facial pain.  Id.  The ALJ further stated that

21  Plaintiff's October 2010 x-ray of cervical spine showed only some minimal degenerative changes

22  and a region of postoperative change in his scalp soft tissues, and that Dr. Alksne referred Plaintiff

23  back to his primary care provider for headache management, which the ALJ interpreted as

24  "suggesting no significant neurological or musculoskeletal problem."  Id.

25

26  [3] "Occipital neuralgia is a distinct type of headache characterized by piercing, throbbing, or electric-shock-like chronic pain in the upper neck, back of the head, and behind the ears, usually on one side of the head."  National Institute of Neurological Disorders and Stroke, Occipital Neuralgia Information Page, last updated Dec. 14, 2009,

27  http://www.ninds.nih.gov/disorders/occipitalneuralgia/occipitalneuralgia.htm (last visited May 26, 2015); see also Rizzi v. Hartford Life and Acc. Inc. Co., 383 F.App'x. 738, 747 (10th Cir. 2010); Bjornson v. Astrue, 671 F.3d 640, 642 (7th

28  Cir. 2012) (defining occipital neuralgia as "a type of headache that involves piercing, throbbing, or 'electric-shocklike' chronic pain in the neck and head.").

1    The ALJ also reviewed the notes of Dr. Sabourin, who conducted an orthopedic consultative
2    examination of Plaintiff.  Id.  The ALJ observed that Plaintiff reported pain in the left side of his
3    head, elbow and toes, and occasional pain over his tibial tubercles, and noted that Plaintiff's
4    physical examination produced "few significant findings."  Id.  Specifically, the physical
5    examination revealed, *inter alia*, that Plaintiff had a satisfactory gait, moved without apparent
6    difficulty or pain, got on and off the exam table and in an out of a chair without difficulty, and did
7    not require an assistive device.  Id.  Plaintiff's cervical and lumbar spine had grossly normal range
8    of motion without spasm or swelling, his "straight leg raising" was negative, and while Plaintiff's
9    cervical spine had some tenderness, his lumbar spine did not have any swelling.  Id.  Further,
10   Plaintiff's shoulders, wrists, hands, hips, and ankles had grossly normal and painless range of
11   motion, no tenderness, warmth, crepitus, instability or swelling, and Plaintiff's elbows had grossly
12   normal and painless range of motion, some tenderness over the medial epicondyle, negative Tinel
13   sign, and no other abnormalities.  Id.  The ALJ also cited Dr. Sabourin's report noting that
14   Plaintiff's knees had some minimal tenderness over his tibial tubercles, but good range of motion,
15   and no instability, redness, swelling, crepitus, effusion or deformity.  Id.  Plaintiff's left toes had
16   some slight tenderness, but did not exhibit significant abnormality.  Id.

17       Additionally, the ALJ reviewed Dr. Sabourin's neurological examination of Plaintiff, which
18   revealed that Plaintiff had some mildly decreased sensation in his left leg and arm, but full motor
19   strength in his upper and lower extremities, and normal reflexes and pulses.  Id. at 19-20.  The
20   ALJ noted Dr. Sabourin's diagnosis of trigeminal neuralgia, status post trigeminal neuralgia
21   surgery, unexplained pain in Plaintiff's left medial epicondyle and left toes, and mild bursitis of his
22   tibial tubercles bilaterally.  Id. at 20.

23       Further, the ALJ cited the records from the State Agency's medical consultants, Drs. Jacobs
24   and Haaland, both of whom opined that Plaintiff did not have a severe medical impairment after
25   observing that Plaintiff's medical record established that Plaintiff was "status post a craniotomy
26   for relief of trigeminal neuralgia" with satisfactory results, and that despite Plaintiff's allegations
27   of pain, his physical exam established that Plaintiff had normal gait, balance and range of motion,
28   and full motor strength in all his extremities.  Id.  The ALJ further noted that Dr. Sabourin opined

that Plaintiff had no orthopedic restrictions.  Id.

Finally, the ALJ cited the testimony of Dr. Janese, an impartial medical expert, that the objective medical findings were essentially normal and that he did not find a basis for functional limitations, explaining that the medical evidence did not support Plaintiff's subjective complaints of pain, and that Plaintiff reported that his cranial surgery made him "pain free."  Id. at 20-21. The ALJ also noted Dr. Janese's observation that Plaintiff's continued numbness on the left side of his tongue could have been residual from Plaintiff's inner cranial surgery.  Id. at 21.

**FACTUAL BACKGROUND**

**A.    Plaintiff's Education and Employment History**

Plaintiff was born in Vietnam on October 27, 1960, and was forty-nine years old at the alleged onset of disability.  Id. at 30-33, 137, 147, 169.  Plaintiff moved to the United States in 1989, has a grade-school education, is married, and has four children.  Id. at 32-33, 137-38. Plaintiff worked in the sewing industry in 1991-92, and testified that he stopped working on January 1, 1993, because of "lack of work in textiles."  See id. at 30, 174-77, 185-87, 210; see also id. at 163-68.  Plaintiff also testified that he "quit his job" because he "c[ould] not do a job" after having his ear and sinus surgeries.[4]  Id. at 33.  Plaintiff explained that after he stopped working, his wife supported him financially and he received benefits from the government as aid to families with dependent children.  Id. at 34.

**B.    Plaintiff's Medical History**

Plaintiff had bilateral ear surgeries for recurrent ear infections and a sinus surgery for a polyp resection.  Id. at 246, 260.  In May 2008, Dr. Boris Khamishon examined Plaintiff and noted that Plaintiff's general physical examination was within the norm.  Id. at 322-23.  Dr. Khamishon's neurological examination revealed decreased sensation to pinprick in Plaintiff's occipital nerve bilaterally and "tenderness to palpation over the occipital notch," that Plaintiff's muscle strength was "5/5," no atrophy, rigidity, fasciculations, and no abnormal involuntary movements.  Id. at

---

[4] The record reflects that after moving to the United States, Plaintiff had bilateral ear surgeries for recurrent ear infections and a sinus surgery for a polyp resection, but does not contain the exact dates of the surgeries.  See id. at 246, 260.

323.  Dr. Khamishon noted "no history of depression, anxiety or schizophrenia" and "no history of mood disorder."  Id.  Dr. Khamishon further stated that Plaintiff reported a history of headaches, which occasionally evolved into "a migraine headache with nausea, vomiting, photo- and phonophobia and blurry vision," and diagnosed Plaintiff with occipital neuralgia, migraine headaches, chronic neck pain, and history of hypertension.  Id. at 322, 324.  Dr. Khamishon recommended Imitrex for Plaintiff's migraine headaches, occipital nerve injections, and referred Plaintiff for a cervical MRI.  Id. at 324.  Plaintiff's May 2008 cervical MRI revealed minimal annular bulging at C3-4 and C5-6, no cord or root impingement, and was otherwise unremarkable.  Id. at 325.

In January 2009, Plaintiff was admitted to Sharp Memorial Hospital's Emergency Room complaining of a strong headache.  Id. at 220-22.  The hospital notes indicate that Plaintiff reported having "head pain x 1 week," a history of trigeminal neuralgia and high blood pressure, and assessed the intensity of his pain as 9 out of 10.  Id. at 221.  Plaintiff's CT scan of the head without contrast was within the norm.  Id. at 219.

At Dr. Khamishon's request, Plaintiff had an MRI and MRA of his brain in February 2009.  Id. at 320.  The MRI and MRA were "unremarkable" and indicated that Plaintiff's superior cerebellar artery was in "close proximity to the left trigeminal nerve" and that there was no evidence of an aneurysm or mass.  Id.

Dr. Khamishon referred Plaintiff to Dr. Alksne, a neurosurgeon at UCSD Medical Center who examined Plaintiff in March 2009.  Id. at 223-25.  Dr. Alksne's notes indicate that Plaintiff reported that "approximately 7 years ago while brushing his teeth [Plaintiff] had the sudden onset of a shocking pain in the left side of his face," which had "come and gone," and was frequently "associat[ed] with a pain in the back of the head and upper neck on left side."  Id. at 223.  Plaintiff further reported that he had been diagnosed with migraine headaches and prescribed migraine medication, which Plaintiff alleged did not relieve the pain, and that his pain "gradually spread into his left eye with a combination of burning and stinging" and became more severe.  Id.  Dr. Alksne also noted that Plaintiff was prescribed Tegretol and reported "marked," but not "complete" improvement, and was seeking surgical pain management options.  Id.

Dr. Alksne conducted a physical examination and concluded that Plaintiff was a "healthy-appearing male in no acute distress," that Plaintiff walked with a normal gait, climbed on and off the exam table with ease, had good use of all of his extremities, was alert and oriented, but complained of blurry vision in the left eye. Id. at 223-24.  Dr. Alksne further noted that Plaintiff's facial sensation, motor power, hearing, speech, and swallowing were normal. Id. at 224.  Dr. Alksne reviewed the MRI scan brought by Plaintiff, and noted that the scan showed no evidence of mass lesions or multiple sclerosis. Id.

In April 2009, Plaintiff underwent an MRI of the brain with contrast, which revealed a crossover of the left superior cerebellar artery with the left trigeminal nerve. Id. at 236.  After reviewing Plaintiff's brain scans, Dr. Alksne determined that Plaintiff had "intractable left-sided trigeminal neuralgia," and that the scan showed "a definite vessel in contact with the left trigeminal nerve in the revision region of the root entry zone," and recommended surgical intervention. Id. at 247-48.

Plaintiff's pre-operative examination notes taken in May 2009 reflect that Plaintiff complained of left-sided facial pain, which he assessed at 7 out of 10, that Plaintiff had an "8-year history of left-sided facial pain, which began suddenly as a headache and ha[d] progressed to involve sharp pain at the base of his left eye," and that Plaintiff had bilateral ear surgeries for recurrent ear infections, had decreased hearing in his left ear, a sinus surgery for a polyp resection, and was hypertensive.  Id. at 246.

On May 13, 2009, Dr. Alksne performed a left retromastoid craniectomy with microvascular decompression of the left trigeminal nerve, subsequent to which Plaintiff was discharged in "good" condition. Id. at 231, 242-45.  Plaintiff's surgical follow-up appointment notes from UCSD Medical Center indicate that Plaintiff reported that he was "pain free with respect to the trigeminal neuralgia," but had numbness in the left jaw and forehead area, and dry eye. Id. at 241.

In June 2009, Plaintiff had a follow-up appointment with Dr. Alksne, who noted that Plaintiff "ha[d] none of his preoperative tic pain," but complained of numbness in his left lower face, tongue, and behind his left ear. Id. at 240.  Dr. Alksne concluded that Plaintiff's wound was "healing well," and that "the numbness around the left ear [wa]s most likely related to the

1  surgical incision and w[ould] definitely clear over time." Id.  Dr. Alksne also noted that "patient
2  numbness of the left face is harder to explain as no nerve CT was made," and opined that the
3  facial numbness would likely gradually clear over time.  Id.

4    In July 2009, Plaintiff had another appointment with Dr. Alksne and reported that "he [wa]s
5  doing well regarding his trigeminal neuralgia," but continued to have bilateral occipital headaches.
6  Id. at 239.  Dr. Alksne opined that Plaintiff's headaches were "secondary to occipital neuralgia and
7  not his trigeminal neuralgia," and might have been related to secondary muscle spasms resulting
8  from Plaintiff's operation.  Id.  Dr. Alksne referred Plaintiff for physical therapy and cervical spine
9  MRI scan to rule out any significant cervical pathology.  Id. at 233-34, 239.

10   Plaintiff underwent physical therapy subsequent to his surgery.  Id. at 271, 277, 292-93.
11 In October 2009, Plaintiff's physical therapist stated in her Progress Report that Plaintiff
12 complained of "constant 1-7/10 intensity occipital and upper cervical pain except for when
13 [Plaintiff] t[ook] pain medication," and that Plaintiff reported that the left side of his face was
14 numb.  Id. at 293.  The therapist further stated that Plaintiff did not have a decreased sensation
15 in his upper extremity, and that his upper extremities' strength was "5/5."  Id.  Plaintiff's cervical
16 range of motion was "improved and less painful," and the left side of Plaintiff's face was numb.
17 Id.

18   In January 2010, Plaintiff's physical therapist wrote another Progress Report, in which she
19 stated that Plaintiff reported feeling better after starting physical therapy, and that Plaintiff "noted
20 most improvement after surgery."  Id. at 292.   Plaintiff also reported face numbness and
21 "constant vertical/occipital pain . . . 7-8/10 without medication," and that the pain was "2-4/10
22 with medication."  Id.  The report further noted decreased sensation to light touch in Plaintiff's
23 upper extremity and tenderness to palpation, and "5/5" strength in Plaintiff's upper extremities.
24 Id.  The therapist observed that Plaintiff was "recovering well from surgery, with some residual
25 pain and neurological symptoms."  Id.

26   In December 2009, Dr. Gonzalo Verdugo-Wilson examined Plaintiff for bilateral ear popping
27 and noted that Plaintiff had two ear surgeries fifteen years ago for infection, had a hearing loss
28 in his right ear, and an occasional otalgia, which Plaintiff noted after treatment for trigeminal

1    neuralgia.  Id. at 260.  The impression was "Eustachian tube dysfunction versus TMJ related
2    clicking," and history of bilateral surgeries with no infection.  Id.

3         In March 2010, Dr. Khamishon reviewed Plaintiff's neurological tests.  Id. at 317-19.  Dr.
4    Khamishon assessed "normal study" in the lower extremities, lumbar radiculopathy, and tibial or
5    peroneal mononeuropathy.  Id. at 319.

6         In October 2010, Dr. Alksne examined Plaintiff.  Id. at 339.  Plaintiff reported "persistent
7    left occipital headache" and "persistent numbness" in his left face and tongue, "no face pain," and
8    that he did physical therapy "without benefit."  Id.  Dr. Alksne agreed to provide Plaintiff with a
9    cervical collar and reordered a C-spine x-ray.  Id.  A week later, Dr. Alksne reviewed Plaintiff's x-
10   ray and noted that it "suggest[ed] mass over craniectomy site and retained staples.  Exam reveals
11   prominent cranioplasty but no evidence and no staples found in scalp."  Id.  Dr. Alksne instructed
12   Plaintiff to "[r]eturn to PCP [primary care physician] for headache management."  Id.

13        Dr. Ngoc Minh Pham has been Plaintiff's treating physician since 2002, and has treated
14   Plaintiff for trigeminal neuralgia, chronic headache, pain on left side of Plaintiff's face, neck, arm,
15   torso and leg, hypertension, and arthritis, and has prescribed various medications, including
16   Carbamazephine and Vicodin.  Id. at 178, 181, 252-59, 328-38.  Dr. Pham's appointment notes,
17   which are not entirely legible, indicate that Plaintiff regularly saw Dr. Pham, and include diagnoses
18   of trigeminal neuralgia, hypertension, arthritis, neck pain, headache, and hearing loss in Plaintiff's
19   left ear.  Id. at 252-59, 327-38.  The notes from more than half of Plaintiff's visits specifically
20   reference complaints made by Plaintiff of headaches or sub-occipital headaches under head
21   abnormalities.  Id. at 254, 56-59, 328, 330-32, 335, 337.  Several notes also reference complaints
22   about mouth and eye pain.  Id. at 254-56, 258-59, 329-30, 332, 334, 337-38.  Further, the notes
23   indicate that Dr. Pham instructed Plaintiff to return on an as needed basis.  See id. at 252-59,
24   328-38.  On July 1, 2011, Dr. Pham referred Plaintiff to UCSD neurologist Dr. Delaney for
25   diagnosis and treatment of migraine headache, left trigeminal neuralgia, chronic neck pain, and
26   occipital neuralgia.  Id. at 327.

27        On April 5, 2010, Dr. Sabourin provided a summary report of the orthopedic consultation
28   he performed at the request of the Department of Social Services.  Id. at 295-99.  Dr. Sabourin

noted that Plaintiff reported "no specific injury," but claimed that eight years ago he had developed head pain radiating to the left ankle and all toes of his left foot, and that he was diagnosed with trigeminal neuralgia. Id. at 295. Plaintiff further reported that after the surgery in May 2009, "some of his eye problems [we]re gone," but that he "continue[d] to have pain over the entire left side of his head," elbow, and the toes of his feet, and alleged that the surgery did not provide significant pain relief. Id. Plaintiff described the "burning, throbbing pain in the left side of his head as his major difficulty." Id. Under family history, Plaintiff reported that his mother had mental problems. Id. at 296.

Dr. Sabourin observed that Plaintiff was a "well-nourished, well-developed male in no acute distress." Id. Dr. Sabourin's physical examination revealed some tenderness in the left side of Plaintiff's neck and a surgical scar above the left ear, but otherwise was unremarkable. Id. Other than some tenderness in the elbows and toes, the examination of the extremities was within the norm. Id. at 297. Dr. Sabourin's neurological examination revealed that Plaintiff had "normal motor strength throughout the upper and lower extremities bilaterally (5/5)," some decreased sensation in left leg and left arm, mild deficiency in left arm compared to his right arm, normal deep tendon reflexes, and "[n]o clonus, spasticity, or rigidity." Id. at 298. The report listed the following impressions: (1) "[t]rigeminal neuralgia, status post trigeminal neuralgia surgery"; (2) "[u]nexplained pain in the left medial epicondyle and the left toes"; and (3) "[m]ild bursitis of the tibial tubercles bilaterally." Id. Dr. Sabourin concluded that "[f]rom an orthopedic viewpoint, [Plaintiff] ha[d] almost no significant problems. His problems appeared to be neurosurgical." Id. Dr. Sabourin further stated that based on an orthopedic evaluation, he could not find any orthopedic restrictions. Id.

On April 15, 2010, a State agency reviewing physician Dr. Jacobs assessed Plaintiff's condition. Id. at 302-03. Dr. Jacobs noted in his Case Analysis that Plaintiff had a craniotomy for relief of trigeminal neuralgia with a "satisfactory result," but noted that Plaintiff alleged a continuing headache with radiation to left foot. Id. Dr. Jacobs further wrote that consultative examination revealed that Plaintiff had normal gait and balance, normal range of motion and motor strength in all extremities, and that he was not given any restrictions. Id. Dr. Jacobs then

concluded that Plaintiff's condition was "non-severe."  Id.

On July 22, 2010, another State agency reviewing physician Dr. Haaland affirmed Dr. Jacobs' assessment.  Id. at 312.  Dr. Haaland's Case Analysis contained a notation that at the reconsideration level, Plaintiff did not allege any worsening and did not set forth any new allegations and treating sources.  Id.  After reviewing Plaintiff's medical evidence, Dr. Haaland affirmed the prior assessment.  Id.

Dr. Janese, a board-certified neurosurgeon, reviewed Plaintiff's medical records and testified at Plaintiff's September 23, 2011 hearing that he would diagnose Plaintiff with "atypical left-sided facial pain," but not trigeminal neuralgia.  Id. at 37-40, 105.  Dr. Janese acknowledged that Plaintiff had been previously diagnosed with trigeminal neuralgia or tic douloureaux, but stated that the condition is associated with "extremely severe pain" that lasts for seconds and has trigger zones, and concluded that none of those symptoms were present in Plaintiff's case.  Id. at 38.  Dr. Janese further noted that Plaintiff's problems were "subjective," that all of Plaintiff's examinations and the MRI and MRA were normal, and that Plaintiff's pain "was treated successfully either medically or surgically."  Id. at 37-39.  Dr. Janese based his finding in part on the fact that subsequent to Plaintiff's May 2009 surgery, Plaintiff "did well" and was "pain free," and reported a "marked improvement" after taking Tegretol.  Id. at 37.  Dr. Janese concluded that Plaintiff did not satisfy any listed impairments for neurological disorder, did not establish any basis for an exertional residual functional capacity limitation, and assigned Plaintiff a residual functional capacity of a "medium."  Id. at 38-39.  In response to a question from counsel, Dr. Janese defined occipital neuralgia.  Id. at 40.

## **STANDARD OF REVIEW**

Section 405(g) of the Social Security Act permits unsuccessful applicants to seek judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited in that a denial of benefits will not be disturbed if it is supported by substantial evidence and contains no legal error.  Id.; Batson v. Comm'r Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004).

Substantial evidence is "more than a mere scintilla, but may be less than a

preponderance." <u>Lewis v. Apfel</u>, 236 F.3d 503, 509 (9th Cir. 2001) (citation omitted).   It is "relevant evidence that, considering the entire record, a reasonable person might accept as adequate to support a conclusion." <u>Id.</u> (citation omitted); <u>see</u> <u>also</u> <u>Howard ex rel. Wolff v. Barnhart</u>, 341 F.3d 1006, 1011 (9th Cir. 2003).  "In determining whether the [ALJ's] findings are supported by substantial evidence, [the court] must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the [ALJ's] conclusion." <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1998) (citations omitted).  Where the evidence can reasonably be construed to support more than one rational interpretation, the court must uphold the ALJ's decision.  <u>See</u> <u>Batson</u>, 359 F.3d at 1193.  This includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts.  <u>See</u> <u>Lewis</u>, 236 F.3d at 509.

Even if the reviewing court finds that substantial evidence supports the ALJ's conclusions, the court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching his or her decision.  <u>See</u> <u>Batson</u>, 359 F.3d at 1193.  Section 405(g) permits a court to enter judgment affirming, modifying, or reversing the Commissioner's decision.  42 U.S.C. § 405(g).  The reviewing court may also remand the matter to the Social Security Administration for further proceedings.  <u>Id.</u>

## DISCUSSION

Plaintiff alleges that the ALJ erred in finding that his impairment or combination of impairments was non-severe at Step Two of the five-step sequential evaluation process, in evaluating Plaintiff's testimony, and in rejecting the opinions of Plaintiff's treating physicians.  Pl.'s Mot. at 5-19; Pl.'s Reply at 2-7.  Plaintiff further asserts that the Appeals Council erred in rejecting the evidence that Plaintiff submitted in connection with his request for review.  Pl.'s Mot. at 20-25; Pl.'s Reply at 7-10.  Defendant contends that the ALJ's decision is supported by substantial evidence and is free of harmful error, and thus should be affirmed.  Def.'s Mot. at 11-18; Def.'s Reply at 2-4.  Defendant also asserts that the Appeals Council properly evaluated Plaintiff's post-hearing submissions.  Def.'s Mot. at 18-22; Def.'s Reply at 4-5.

///

## I.   Lack of Evidence Establishing Severe Impairment

Plaintiff argues that the ALJ's finding that Plaintiff's impairments are non-severe is erroneous and not supported by substantial evidence.  Pl.'s Mot. at 6-14.  Pursuant to Social Security regulations, the ALJ is required to follow a five-step sequential evaluation process for determining whether a claimant is disabled.  See 20 C.F.R. § 416.920(a).  At the first step, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since December 21, 2009, the alleged onset date of disability.  AR at 16-17.  This finding is not contested.

At the second step, the ALJ must determine whether the claimant has "a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement."  20 C.F.R. § 404.1520(a)(4)(ii).  The inquiry at Step Two is a de minimis screening "to dispose of groundless claims."  Webb v. Barnhart, 433 F.3d 683, 686-87 (9th Cir. 2005) (citation omitted).  A claimant is required to make a "threshold showing" that (1) he has a medically determinable impairment or combination of impairments, and (2) the impairment or combination of impairments is severe.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  The burden of proof is on the claimant to establish a medically determinable severe impairment.  Id.; see also Uy v. Colvin, 2015 WL 351438, at *7 (E.D. Cal. Jan. 26, 2015).

Here, the ALJ found that Plaintiff satisfied the first element but did not satisfy the second.  AR at 17.  The ALJ stated that Plaintiff had the following medically-determinable impairments: "atypical left sided facial pain and headaches; trigeminal neuralgia, status post trigeminal neuralgia surgery; mild bursitis of the tibial tubercles bilaterally; hearing loss; minimal degenerative changes of the cervical spine; and hypertension."  Id.  However, the ALJ found that Plaintiff "d[id] not have an impairment or combination of impairments that ha[d] significantly limited (or [wa]s expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months," and that consequently Plaintiff did not have a "severe impairment or combination of impairments."  Id. (citing C.F.R. § 416.921 et seq.).  Plaintiff contests this finding.  See Pl.'s Mot. at 7-9; Pl.'s Reply at 2-6.

An impairment is "severe" if it significantly limits the claimant's physical or mental ability

to do basic work activities, or the "abilities and aptitudes necessary to do most jobs." See 20 C.F.R. §§ 404.1520(c), 416.920(c), 416.921(b). "Basic work activities" include "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling", "seeing, hearing, and speaking", "[u]nderstanding, carrying out, and remembering simple instructions", "[u]se of judgment", "[r]esponding appropriately to supervision, co-workers and usual work situations", and "[d]ealing with changes in a routine work setting." Id. § 404.1521(b)(1)-(6). However, "[t]he mere existence of an impairment is insufficient proof of a disability." Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993). In other words, a medical diagnosis alone does not make an impairment qualify as "severe." Id. Further, a medical problem which can be controlled by medication is not severe. See Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) (stating that "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

In this case, the ALJ carefully reviewed all of the medical records and concluded:

> Overall, this objective medical evidence and the claimant's longitudinal treatment history shows [sic] his treatments have been relatively successful, and that his impairments, even when combined do not cause more than minimal functional limitations and are thus not severe.

AR at 20. In his pleadings, Plaintiff does not identify any treating or examining physician who opined that Plaintiff's medical conditions limited his ability to perform basic work activities or constituted a severe impairment or combination of impairments.[5] See Pl.'s Mot. at 6-19; Pl.'s Reply at 1-6. Moreover, the Court has reviewed the medical records and found no evidence establishing that any physician opined that Plaintiff's pain is debilitating or that his impairments are severe. See SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996). Rather, as cited by the ALJ, the medical experts, Drs. Jacobs and Haaland, reviewed Plaintiff's medical records and opined that Plaintiff's condition was non-severe. AR at 303, 312. The fact that no physician found Plaintiff to have a severe impairment supports the ALJ's determination that no such impairment exists.

---

[5] In his Reply, Plaintiff argues that a treating physician diagnosed him with a medically determinable physical impairment (occipital neuralgia) and that a non-treating physician opined that occipital neuralgia "should be debilitating" and that therefore Plaintiff had debilitating occipital neuralgia. Reply at 1-3. The Court addresses this argument in section B below.

1   See Ukolov v. Barnhart, 420 F.3d 1002, 1005-06 (9th Cir. 2005) (finding that the ALJ did not err

2   in finding lack of impairment at Step Two where, *inter alia*, physicians made no finding of

3   impairment, but only restated claimant's own descriptions of his problems).

4   **II.   Plaintiff's Challenges to the ALJ's Decision**

5          Plaintiff's argument during the administrative process and in this litigation was and is that

6   his pain was so severe it rendered him unable to work and that the ALJ erred in discounting his

7   pain.[6]  In presenting this argument to the ALJ, Plaintiff relied primarily on his own testimony and

8   statements to medical providers.  As Plaintiff's attorney explained

9          this is an unusual case, and it really boils down to this subjective pain, whether
       that's credible and whether it's credible at the extent that this Claimant alleges.  If
10      he is found credible, my position would be that the pain is severe it would prevent
       any work activity.  But it does not – the impairment does not cause exertional
11      limitations.  It's a total incapacity issue based on head pain, facial pain, occipital
       pain.
12

13   AR at 41.  In the current motion for summary judgment, Plaintiff claims that the ALJ improperly

14   discounted Plaintiff's subjective claims of severe pain, improperly relied on the fact that Plaintiff

15   had not worked for many years prior to his onset of disability date, and improperly disregarded

16   the medical expert's testimony that Plaintiff had a "severe" impairment.  See Pl.'s Mot. at 6-18;

17   Pl.'s Reply at 3-6.  The Court will address each of these arguments.

18          **A.      Plaintiff's Credibility and Subjective Pain Claims**

19          Plaintiff argues that the ALJ erred in discrediting Plaintiff's testimony regarding the severity

20   of his pain.  See Pl.'s Mot. at 9-18; see also id. at 4-6; 24-25.  Social Security Ruling 96-7p

21   provides the following standard to evaluate a claimant's credibility:

22          In determining the credibility of the individual's statements, the adjudicator must
       consider the entire case record, including the objective medical evidence, the
23      individual's own statements about symptoms, statements and other information
       provided by treating or examining physicians or psychologists and other persons
24      about the symptoms and how they affect the individual, and any other relevant
       evidence in the case record. An individual's statements about the intensity and
25

26          [6] Plaintiff cites his hearing testimony that he experienced "hard pain," and that he "fe[lt] pain every day."
     AR at 35.  Plaintiff further described his pain after the May 2009 surgery as follows: "I feel [sic] just want to kill
27   myself, but because of my wife and my children love me and they encourage me. So I just want to live." Id. at 35-
     36. Plaintiff also testified that he was "depressed before the [May 2009] operation . . . because the doctor could not
28   find the problem, the cause of [his] problem, for four or five years," and that after his May 2009 surgery he "fe[lt]
     better," and experienced "pain in the three or four," based on the scale of ten. Id. at 36.

1   persistence of pain or other symptoms or about the effect the symptoms have on
2   his or her ability to work may not be disregarded solely because they are not
    substantiated by objective medical evidence.

3   SSR 96-7p, 1996 WL 374186, at *2-4 (July 2, 1996). The Ninth Circuit has established a two-part

4   test for evaluating a claimant's subjective symptoms. See Lingenfelter v. Astrue, 504 F.3d 1028,

5   1036 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented

6   objective medical evidence of an underlying impairment which could reasonably be expected to

7   produce the pain or other symptoms alleged." Id. (citation and internal quotation marks omitted).

8   The claimant, however, need not prove that the impairment reasonably could be expected to

9   produce the alleged degree of pain or other symptoms; the claimant need only prove that the

10  impairment reasonably could be expected to produce some degree of pain or other symptom.

11  Id. If the claimant satisfies the first element and there is no evidence of malingering, then the

12  ALJ "can [only] reject the claimant's testimony about the severity of her symptoms . . . by offering

13  specific, clear and convincing reasons for doing so." Id. (citation and internal quotation marks

14  omitted). "General findings are insufficient; rather, the ALJ must identify what testimony is not

15  credible and what evidence undermines the claimant's complaints." Reddick, 157 F.3d at 722

16  (quoting Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995)). The ALJ's findings must be

17  "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit

18  [Plaintiff's] testimony." Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002).

19      When weighing the claimant's testimony, "an ALJ may consider . . . reputation for

20  truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and

21  unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course

22  of treatment." Orn v. Astrue, 495 F.3d 625, 636 (9th Cir. 2007) (internal quotation marks and

23  citation omitted). An ALJ also may consider the claimant's work record and testimony from

24  doctors and third parties regarding the "nature, severity, and effect of the symptoms" of which

25  the claimant complains. Thomas, 278 F.3d at 958-59; see also 20 C.F.R. § 404.1529(c). If the

26  ALJ's finding is supported by substantial evidence, the court may not second-guess his or her

27  decision. See Thomas, 278 F.3d at 959; Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155,

28  1163 (9th Cir. 2008) (where the ALJ's credibility assessment is supported by substantial evidence,

it will not be disturbed even where some of the reasons for discrediting a claimant's testimony were improper).

Here, the ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not fully credible . . . ." AR at 18. In reaching this conclusion, the ALJ considered each of Plaintiff's claims and discussed at length the objective medical evidence that contradicted Plaintiff's claims. AR at 18-20. The ALJ further explained:

> [The] objective medical evidence and the claimant's longitudinal treatment history shows [sic] that his treatments have been relatively successful, and that his impairments, even when combined, do not cause more than minimal functional limitations and are thus not severe.

> Additional factors show that the claimant's allegations are not fully credible. There is no evidence that the claimant's activities of daily living are significantly diminished due to any medical problem or that he is dependent on his family. Indeed, he reported that he is able to tend to his own personal needs (Exhibit 5E/3, 7E/3).

> [A]lthough the claimant has received various forms of treatment for his allegedly disabling symptoms, which would normally weigh somewhat in the claimant's favor, the record also reveals that the treatment has been generally successful in controlling those symptoms. Specifically, the claimant's surgery significantly improved his pain and his medications made him feel "a lot better" (Exhibits 4F/6-7; 6F/23, 28). Additionally, he underwent physical therapy and reported feeling better (Exhibits 6F/26, 28).

> The claimant's work history also shows that his allegations are not fully credible. There is evidence that the claimant stopped working for reasons not related to his allegedly disabling impairments. Specifically, he reportedly stopped working well before his alleged onset date in 1993 due to a lack of work in the textiles industry (Exhibit 2E).

> Additionally, the claimant had a very poor work record long before he allegedly became unable to work. In fact, his earnings record shows that he has not worked since 1992 (Exhibits 10D, 12D, 3E, 9E). His failure to work for years when he could have done so reflects poorly on his motivation for gainful employment regardless of any alleged limitations.

Id. at 20. Finally, the ALJ discussed how the opinions of the medical experts also contradicted Plaintiff's claims. Id. at 21. Plaintiff challenges all of the reasons provided by the ALJ for

1   discounting his symptom testimony.[7]  See Pl.'s Mot. at 9-18.

2          Neither party contests the ALJ's determination that Plaintiff has the following impairments:

3   "atypical left sided facial pain and headaches; trigeminal neuralgia, status post trigeminal

4   neuralgia surgery; mild burstitis of the tibial tubercles bilaterally; hearing loss; minimal

5   degenerative changes of the cervical spine; and hypertension."  AR at 17; see also Pl.'s Mot.; Pl.'s

6   Reply; Def.'s Mot.; Def.'s Reply.   Because the ALJ concluded that Plaintiff's "medically

7   determinable impairments could reasonably be expected to produce the alleged symptoms," the

8   finding which is not contested by the parties, the first prong of the ALJ's inquiry regarding

9   Plaintiff's subjective symptoms is satisfied.  See AR at 18; see also Lingenfelter, 504 F.3d at 1036;

10   Pl.'s Mot.; Pl.'s Reply; Def.'s Mot.; Def.'s Reply.  Furthermore, neither party alleges that the ALJ

11   found that Plaintiff was malingering.  See id.  Consequently, the Court must determine whether

12   the ALJ provided clear and convincing reasons for discounting Plaintiff's subjective claims

13   regarding pain and other symptoms.  See Lingenfelter, 504 F.3d at 1036.

14          Plaintiff argues that the ALJ erred by failing to provide specific, clear and convincing

15   reasons for discrediting Plaintiff's symptom testimony regarding his subjective pain that allegedly

16   prevented him from working since 2002. Pl.'s Mot. at 14-18.  In support, Plaintiff argues that his

17   medical records show that physical therapy afforded "partial and short-lived" relief of his head

18   pain, and no effective relief for radiating neck and left side pain, which, according to Plaintiff,

19   "persisted largely unabated" after his May 2009 surgery.  Id. at 15-16.

20          As previously noted, the ALJ stated the following reasons for finding that Plaintiff's pain

21

22   _____

23          [7]  Plaintiff also asserts that the ALJ should have considered his allegations of depression and suicidal thoughts
     caused by severe head pain.  See Pl.'s Mot. at 18; Pl.'s Reply at 7-10.  However, Plaintiff's testimony alone cannot
     establish the existence of an impairment, because the existence of a medically determinable impairment must be

24   established by medical evidence.  See 20 C.F.R. § 416.908 (providing that a "physical or mental impairment must be
     established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's]

25   statement of symptoms"); Ukolov, 420 F.3d at 1005-06.  Here, although Plaintiff reported to Dr. Sabourin in April
     2010, that his mother had "mental problems," Plaintiff did not report that he himself had mental problems.  See AR

26   at 296.  Notably, Plaintiff's neurologist's, Dr. Khamishon's, report as of May 2008, noted "no history of depression,
     anxiety or schizophrenia," and "no history of mood disorder."  Id. at 323.  Furthermore, as discussed in more detail

27   below, the opinions of Drs. Henderson, Miller, Grisolia and Lessner cited by Plaintiff do not apply to the relevant time
     period in this case, and Plaintiff does not cite to any medical evidence of his alleged mental impairment during the

28   relevant time period.  See Pl.'s Reply at 7-10.

1    testimony was not credible: (1) the objective medical evidence and Plaintiff's "longitudinal

2    treatment history" did not support Plaintiff's "allegations of a disabling physical impairment,

3    combination of impairments or pain symptoms" because treatment was generally successful in

4    controlling Plaintiff's symptoms; (2) independent medical expert opinions did not support Plaintiff's

5    pain allegations; (3) Plaintiff's allegations of debilitation were inconsistent with his activities of

6    daily life; and (4) Plaintiff had a very poor work record, which "show[ed] that his allegations

7    [we]re not fully credible," and "reflect[ed] poorly on his motivation for gainful employment

8    regardless of any alleged limitations." See AR at 19-20.  The Court will consider the validity of

9    each stated reason separately.

10                  **1.    Objective Medical Evidence**

11          The ALJ found that the objective medical evidence did not support Plaintiff's "allegations

12   of a disabling physical impairment, combination of impairments or pain symptoms." Id. at 19.

13   The ALJ concluded that Plaintiff's treatment, including surgery, physical therapy and medications,

14   "ha[s] been generally successful in controlling [Plaintiff's] symptoms." Id. at 20.  The Court's

15   review of the cited medical records establishes that there is substantial evidence supporting the

16   ALJ's determination that Plaintiff's statements regarding the intensity, persistence, and effects of

17   his symptoms are not consistent with the objective medical evidence.  For example, Plaintiff

18   reported to his neurosurgeon, Dr. Alksne, after his May 2009 surgery that he was "pain free with

19   respect to the trigeminal neuralgia" and had none of his preoperative tic pain.  Id. at 239-41.

20   Further, Dr. Alksne's October 2010 examination report reflects that Plaintiff's had "no face pain."

21   Id. at 339.  Likewise, despite Plaintiff's complaints of significant pain, Plaintiff's postoperative

22   medical records indicate that Dr. Alksne referred Plaintiff back to his primary care provider for

23   headache management, and that Plaintiff's treating physician, Dr. Pham, only saw Plaintiff on an

24   as needed basis, which indicated that Plaintiff was not in acute distress, a finding made by

25   Plaintiff's examining physician Dr. Sabourin.  See id. at 252-59, 296, 339.

26          Similarly, the January 2009 notes from Sharp Memorial Hospital's Emergency Room indicate

27   that Plaintiff complained of a strong headache, which he assessed as a "9" out of 10.  Id. at 220-

28   21.  After his May 2009 surgery, Plaintiff reported that the intensity of his pain was "1-7/10 . . .

except for when he [took] medication." Id. at 293.  After several months of physical therapy, Plaintiff reported "feel[ing] better than when he began physical therapy," that he had "noted most improvement after surgery," and that the intensity of his pain was "2-4/10" with medication.  See id. at 292; see also 20 C.F.R. § 404.1513(d) (allowing consideration of evidence from therapists "to show the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to work.").  Plaintiff's medical records thus indicate that his May 2009 surgery, physical therapy and medications provided significant relief by decreasing the pain from a maximum of "9" to "2-4," which negated Plaintiff's assertion of disabling pain.  See AR at 220-21, 292-93; Warre, 439 F.3d at 1006 (providing that "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

Plaintiff's medical records also establish that he had normal muscle strength, thereby suggesting that Plaintiff had not experienced prolonged pain to a disabling degree.  See Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (rejecting claimant's claim that constant pain required her to lie in a fetal position all day where claimant did not exhibit muscular atrophy, which would be a physical sign of a totally incapacitated individual); see also AR at 296, 298 (Dr. Sabourin's notes that Plaintiff's motor strength was "normal throughout the upper and lower extremities bilaterally (5/5)" and that Plaintiff "moved without apparent difficulty or pain"); id. at 323 (Dr. Khamishon's report that Plaintiff's muscle strength was "5/5," there was no atrophy, rigidity, fasciculations, and no abnormal involuntary movements); and id. at 292-93 (physical therapist's reports indicating that Plaintiff displayed "5/5 bilateral upper extremities" strength).  Furthermore, Plaintiff's diagnostic imaging was within the norm.  See id. at 317-20, 325.

Finally, although Plaintiff's medical records contain his reports of pain, these portions of the records do not support a finding of severe impairment because they are based on Plaintiff's own perception and description of his symptoms, and there is no evidence in the record establishing that any physician has concluded that Plaintiff's pain is completely debilitating, such that a return to work would be impossible regardless of the treatment.  See Ukolov, 420 F.3d at 1005-06 (finding that the ALJ did not err in finding lack of impairment at Step Two where, inter alia, physicians made no finding of impairment, but only restated claimant's own descriptions of

his problems); Uy, 2015 WL 351438, at *7 (holding that the ALJ did not err in finding that Plaintiff did not suffer from any severe physical impairment, where, *inter alia*, "[n]o physician opined that Plaintiff would need modifications at work as a result of any of [the alleged] conditions.").

Given the totality of the record, the Court finds that substantial evidence supports the ALJ's conclusion that the objective medical evidence does not support his allegations regarding the intensity, persistence, and limiting effects of his pain.  While the absence of objective medical evidence to support Plaintiff's subjective complaints is a factor an ALJ can consider in discrediting symptom testimony, it cannot be the sole factor.  See Reddick, 157 F.3d at 722 (citing Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir. 1991).  Thus, this reason is not sufficient unless at least one other reason for rejecting Plaintiff's subjective symptoms exists.

## 2.    Medical Opinion Regarding Nature, Severity, and Effect of Plaintiff's Pain

As set forth in section I above, no medical doctor opined that Plaintiff's pain was debilitating or severe, and two experts opined that Plaintiff's condition was non-severe.  See supra pp. 14-16.  In addition, Dr. Janese testified that Plaintiff did not have any exertional limitations and contrasted Plaintiff's situation and symptoms with the severity of symptoms Dr. Janese would expect with a diagnosis of occipital neuralgia.  AR at 39-40; see also id. at 239, 241.  These medical opinions and testimony support the ALJ's conclusion regarding Plaintiff's credibility.  Thomas, 278 F.3d at 958-59 (in weighing a claimant's credibility, ALJ may consider testimony from physicians concerning the nature, severity, and effect of plaintiff's symptoms); Lee v. Astrue, 472 Fed. App'x 553, 555 (9th Cir. 2012) (an ALJ may consider "testimony from physicians . . . concerning the nature, severity, and effect of the symptoms of which [a] claimant complains.").  In addition, Plaintiff's medical records contain several entries indicating that his pain was controlled or lessened with medication, surgery, and treatment.  See AR at 223, 292-93; see also id. at 239-40.  This finding also provides a basis to discount Plaintiff's claims of severe, debilitating pain.  See Schmidt v. Colvin, 2013 WL 5372845, at *9 (E.D. Cal. Sept. 25, 2103) ("Because effective symptom control through medication is a valid reason for rejecting claimant testimony, and there is substantial evidence to support the ALJ's determination, the ALJ had a proper basis

1  to discount plaintiff's testimony."). The Court therefore finds that these reasons provide clear and

2  convincing bases to discredit Plaintiff's claims.

3              **3.    Daily Activities**

4         Plaintiff argues that the ALJ erred in finding that daily activities of "tending to one's

5  personal needs" are inconsistent with the pain-related impairments that he described during his

6  testimony. Pl.'s Mot. at 9, 16-18. In determining a plaintiff's credibility, an ALJ may consider

7  whether a plaintiff's daily activities are consistent with the asserted symptoms. See Thomas, 278

8  F.3d at 958-59 (citation omitted); see also SSR 96-7p, 1996 WL 374186, at *3 (stating that "the

9  adjudicator must consider in addition to the objective medical evidence when assessing the

10 credibility of an individual's statements: . . . [t]he individual's daily activities").[8] While the fact

11 that a plaintiff can participate in various daily activities does not necessarily detract from the

12 plaintiff's credibility as to her specific limitations or overall disability, "a negative inference is

13 permissible where the activities contradict the other testimony of the claimant, or where the

14 activities are of a nature and extent to reflect transferable work skills." Elizondo v. Astrue, 2010

15 WL 3432261, at *5 (E.D. Cal. Aug. 31, 2010). "Daily activities support an adverse credibility

16 finding if a claimant is able to spend a substantial part of her day engaged in pursuits involving

17 the performance of physical functions or skills that are transferable to a work setting." Id. (citing

18 Orn, 495 F.3d at 639; Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999);

19 and Thomas, 278 F.3d at 959). "A claimant's performance of chores such as preparing meals,

20 cleaning house, doing laundry, shopping, occasional childcare, and interacting with others has

21 been considered sufficient to support an adverse credibility finding when performed for a

22 substantial portion of the day." Elizondo, 2010 WL 3432261, at *5 (citing Stubbs–Danielson v.

23 Astrue, 539 F.3d 1169, 1175 (9th Cir. 2008); Burch v. Barnhart, 400 F.3d 676, 680-81 (9th Cir.

24 2005); Thomas, 278 F.3d at 959; Morgan, 169 F.3d at 600; and Curry v. Sullivan, 925 F.2d 1127,

25 1130 (9th Cir. 1990)).

26        Here, the ALJ found that Plaintiff's allegations of debilitation were inconsistent with his

27 _____

28    [8] Social Security Rulings are binding on ALJs. See Terry v. Sullivan, 903 F.2d 1273, 1275 n.1 (9th Cir. 1990).

activities of daily life.   AR at 20.   Specifically, the ALJ noted that there was no evidence establishing that Plaintiff's activities of daily living were significantly diminished due to any medical problem or that Plaintiff was dependent on his family, and that Plaintiff reported that he was able to tend to his own personal needs.  Id.

Although Plaintiff filled out questionnaires in which he stated that he was "able to care for [his] personal needs" and "d[id] not need help in personal care, hygiene or upkeep of a home," there is no further description or discussion of specific activities that Plaintiff engaged in that would bear on his ability to engage in the activities of the workplace, nor is there a discussion of whether Plaintiff engaged in those activities for a substantial part of the day.  See id. at 138, 199, 206; see also Elizondo, 2010 WL 3432261, at *5; Reddick, 157 F.3d at 722 (holding that sporadic activities followed by periods of rest are not inconsistent with subjective complaints of severe pain).  Plaintiff did not testify about his daily activities and the ALJ did not question him about his activities.   See AR at 26-44.  Without such additional facts, Plaintiff's ability to care for his personal needs does not undermine his testimony that he cannot work, and is not a clear and convincing reason for discrediting Plaintiff's subjective symptom testimony.  See Heine-O'Brien v. Astrue, 359 F. App'x 699, 701 (9th Cir. 2009) (citing Orn, 495 F.3d at 639) (the ability to care for personal needs does not necessarily indicate the ability to perform gainful employment); Garrison v. Colvin, 759 F.3d 995, 1016 (9th Cir. 2014) (citing Reddick, 157 F.3d at 722) ("[r]ecognizing that 'disability claimant should not be penalized for attempting to lead normal lives in the face of their limitations,' we have held that '[o]nly if [her] level of activity were inconsistent with [a claimant's] claimed limitations would these activities have any bearing on [her] credibility.").

Because the ALJ failed to provide the requisite clear and convincing reasons for discrediting Plaintiff's testimony based on Plaintiff's daily activities, the Court disregards this basis.  See Thomas, 278 F.3d at 958; Elizondo, 2010 WL 3432261, at *5.

### 4.   Work History

Plaintiff argues that the ALJ erroneously blamed him for not working since 1992 and that the ALJ ignored medical evidence of a fifteen-year history of "multiple ear surgeries, sinus

surgery, brain surgery, chronic head pain and neurovision problems." Pl.'s Mot. at 9. Plaintiff also asserts that although he stopped working in 1994 "due to lack of work in textiles," he could not have worked in 2002 due to illness. Pl.'s Reply at 6 (citing AR at 175).

In determining Plaintiff's credibility, the ALJ cited Plaintiff's records indicating that Plaintiff worked in the sewing industry in 1991-92, that he stopped working on January 1, 1993, because of "lack of work in textiles," and that Plaintiff stated that his condition became severe enough to keep him from working on January 1, 2002. See AR at 174-76, 185-86, 210; see also id. 163-68. Plaintiff's own statements thus indicate that despite his ear and sinus surgeries, he was capable of working for at least nine years from January 1, 1993 until January 1, 2002, but did not do so. Id. Furthermore, Plaintiff reported that the pain symptoms he first experienced in 2002, have "come and gone," and spread "gradually," thereby further undermining his allegations of disabling "illness" that prevented him from working in 2002. Id. at 223; see also Pl.'s Reply at 6. Finally, Plaintiff modified his alleged onset date of disability to December 21, 2009 [AR at 15] and yet did not work between 2002 and 2009. Therefore, the ALJ's finding that Plaintiff "had a very poor work record long before he allegedly became unable to work," is supported by substantial evidence in the record. See AR at 20. As such, the ALJ did not err by considering Plaintiff's extremely poor work history in evaluating his credibility and concluding that Plaintiff's "failure to work for years when he could have done so reflect[ed] poorly on his motivation for gainful employment regardless of any alleged limitations." See id.; see also Thomas, 278 F.3d at 959 (finding that claimant's "extremely poor work history" and "little propensity to work in her lifetime" negatively affected claimant's credibility regarding her inability to work).

### 5. Conclusion

The Court finds that the ALJ provided specific, clear and convincing reasons for rejecting Plaintiff's testimony regarding the intensity, persistence, and limiting effects of his pain. The ALJ pointed to specific evidence in the record, including reports by Drs. Alksne, Sabourin, and Pham, as well as reports from Plaintiff's physical therapy provider and diagnostic imaging results, in identifying the objective medical evidence that undermined the Plaintiff's credibility regarding the severity of his pain. See AR at 18-20. In addition, the ALJ considered the fact that none of

1   Plaintiff's treating or examining physicians and none of the medical experts opined that Plaintiff

2   had severe pain or limitations, or was otherwise disabled.  Id. at 17-21.  The ALJ also found that

3   Plaintiff had a "very poor work record," which negatively affected Plaintiff's credibility regarding

4   his inability to work.  Id. at 20.  Each of these reasons was supported by substantial evidence and

5   together constitute a sufficient basis for discounting Plaintiff's pain and impairment testimony.

6   Because the ALJ's credibility determination is entitled to "great weight," this Court finds no basis

7   for disturbing the ALJ's conclusion.  See Lewis, 236 F.3d at 509.

8           While there may be evidence in the record that contradicts the ALJ's determination or that

9   could be interpreted differently, this Court must defer to the ALJ's credibility determination when,

10   as here, it is supported by substantial evidence.  See id.  As the Ninth Circuit stated, "[i]t may well

11   be that a different judge, evaluating the same evidence, would have found [plaintiff's] allegations

12   of disabling pain credible.  But, . . . in nearly every case where [the Court is] called upon to

13   review a denial of benefits, [the Court is] not [the] trier[ ] of fact.  Credibility determinations are

14   the province of the ALJ."  Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989).  If "the ALJ has made

15   specific findings justifying a decision to disbelieve [the claimant's] allegation of excess pain, and

16   those findings are supported by substantial evidence in the record, [the Court's] role is not to

17   second-guess [the ALJ's] decision."  Id.  Accordingly, the Court must defer to the ALJ's

18   determination and uphold the decision.

19          **B.    Expert Testimony**

20          Plaintiff states that the ALJ's "medical expert testified to [Plaintiff's] severe impairment."

21   Pl.'s Mot. at 7-9; Pl.'s Reply at 2-5.  In support, Plaintiff explains that Dr. Janese, the ALJ's medical

22   expert, assigned Plaintiff a residual functional capacity of "medium," which meant that he

23   "explicitly found [Plaintiff's] condition "severe" under the five-steps process of disability

24   determination."  Pl.'s Mot. at 7-8 (footnote omitted).  Plaintiff further explains that Dr. Janese

25   testified that occipital neuralgia "should be debilitating" and since Drs. Pham and Grisolia

26   diagnosed him with occipital neuralgia, Plaintiff's pain must be debilitating.  See id.; Pl.'s Reply

27   at 3, 6.  Plaintiff therefore argues that the ALJ erred in discounting this finding of debilitating pain.

28   Id. Defendant argues that Plaintiff misstates Dr. Janese's testimony.  Def.'s Mot. at 12-13; Def.'s

Reply at 2.

The Court has reviewed Dr. Janese's testimony and concludes that Dr. Janese did not conclude that Plaintiff had a severe condition and debilitating pain.  AR at 36-40.  Initially, Dr. Janese summarized the medical records that he had reviewed and noted that the vast majority, if not all, of Plaintiff's examinations and tests were normal.  Id. at 37-39.  Dr. Janese identified several possible listings of impairments and testified that Plaintiff did not satisfy any of them.  Id. at 38.  Dr. Janese also noted that Plaintiff's "problems are basically subjective" and that Plaintiff's pain "was treated successfully either medically or surgically."  Id. at 38-39.  Dr. Janese concluded that Plaintiff did not satisfy any listed impairments for neurological disorder, and stated the following:

> [t]he functional residual capacity, Your Honor, I'm not sure.  I did not find any basis for exertional.  I'm not sure what the basis would be for me to give him some type of residual functional capacity, but with his size and he's a male, 50, I would say probably medium.

Id. at 39.  Plaintiff's attorney then questioned Dr. Janese, including the following exchange:

> [Plaintiff's attorney]  Okay.  Now I see in the record there's diagnosis later, after [Plaintiff's] surgery for the trigeminal nerve, a possible occipital neuralgia.
>
> [Dr. Janese]  Well, that would be different.  That would be that the occipital nerve, (INAUDIBLE) occipital nerves come up from the back of the head and many times, I shouldn't say many times, but occasionally that is diagnosed and it's treated with a neurectomy after a block of (INAUDIBLE).  If you did have occipital neuralgia, you'd have that on one side, not both sides, and it should be debilitating.  You need to find out what's causing it. . . . If you stop injuring it, the nerve will grow back.  It's a virtual nerve (INAUDIBLE).

Id. at 40.

The Code of Federal Regulations provides that "impairment(s) and related symptoms, such as pain, may cause limitations of function or restrictions which limit [a claimant's] ability to meet certain demands of jobs," and that limitations are "exertional if they affect [a claimant's] ability to meet the strength demands of jobs," including sitting, standing, walking, lifting, carrying, pushing, and puling. 20 C.F.R. § 416.969a(a).  "[R]esidual functional capacity is the most [a claimant] can still do despite [his or her] limitations." Id. § 416.945(a).  The record demonstrates that Dr. Janese did not find any basis for exertional limitations and was unsure about a basis for

1   any residual capacity assessment, but suggested that a male of Plaintiff's age and size could
2   probably perform medium exertion.  See AR at 39.  Contrary to Plaintiff's assertion, Dr. Janese
3   did not find that Plaintiff had a residual functional capacity of "medium" and that that residual
4   functional capacity translates to a "severe" impairment under the Social Security guidelines.

5          Similarly, Dr. Janese did not determine that Plaintiff had been diagnosed with occipital
6   neuralgia and that he suffered from debilitating pain.  Rather, counsel's question mentioned a
7   "possible occipital neuralgia" and Dr. Janese responded by describing how occipital neuralgia
8   presents and distinguishing Plaintiff's symptoms from the symptoms associated with the condition.
9   Id. at 40.  The context of Dr. Janese's testimony suggests that he did not believe that Plaintiff's
10  condition was debilitating.  See id. at 37-40.  This conclusion is supported by Dr. Janese's
11  testimony that all of Plaintiff's diagnostic examinations were within the norm, and that there was
12  no apparent basis for limiting Plaintiff's residual capacity, other than Plaintiff's gender, age and
13  size.  Id. at 39.  Accordingly, the Court concludes that, contrary to Plaintiff's assertions,  Dr.
14  Janese's testimony did not establish that Plaintiff had a "severe" impairment or combination of
15  impairments.

16         Furthermore, although Plaintiff identifies evidence of his occipital neuralgia diagnosis, a
17  medical diagnosis alone does not make an impairment qualify as "severe," especially considering
18  other evidence in the record establishing that Plaintiff's treatment, including surgery, medications,
19  and physical therapy, alleviated some of his pain.  See Matthews, 10 F.3d at 680 ("[t]he mere
20  existence of an impairment is insufficient proof of a disability."); Warre, 439 F.3d at 1006
21  ("[i]mpairments that can be controlled effectively with medication are not disabling for the
22  purpose of determining eligibility for SSI benefits.").

23         Accordingly, the Court finds that Dr. Janese did not testify that Plaintiff had a severe
24  disabling impairment with debilitating pain and the ALJ did not err in concluding that Dr. Janese
25  did not present such an opinion.

26
27
28

## C.     Plaintiff's Treating Physicians[9]

Plaintiff final argument with regard to the sufficiency of the ALJ's decision is that the ALJ failed to provide sufficient reasons for rejecting the "assessment" of Plaintiff's treating physician, Dr. Ngoc Minh Pham, and accepting a contrary opinion by an examining physician, Dr. Sabourin. Pl.'s Mot. at 18.  Plaintiff does not identify the specific assessment or diagnosis at issue but cites to page 327 of the Administrative Record.  Id.  Plaintiff continues by asserting that Dr. Sabourin's report is not entitled to "any weight" because he only opined about Plaintiff's orthopedic impairments, not his neurologic ones.   Id. at 18-19.   Plaintiff further argues that the ALJ erroneously relied on the finding of non-severe neurological impairments from non-treating and non-examining physicians, Dr. Jacobs and Dr. Haaland, who Plaintiff asserts "relied on Dr. Sabourin's finding of non-orthopedic disability but came to the conclusion of non-neurologic disability."  Pl.'s Mot. at 19;  Pl.'s Reply at 6-7.

Defendant responds that "there is no medical opinion from Dr. Pham," and that, at most, Dr. Pham assessed various conditions, such as neuralgia, and that a diagnosis does not establish the severity of a condition nor the limitations associated with the condition.  Def.'s Mot. at 13-14; Def.'s Reply at 2.  Defendant states that although Dr. Sabourin's examination was "primarily orthopedic," Dr. Sabourin did make neurological findings, and asserts that Plaintiff does not identify any conflict between Dr. Sabourin's and Dr. Pham's findings.  Def.'s Mot. at 14.  Finally, Defendant argues that even if a conflict existed between the two doctors, the ALJ was allowed to rely on Dr. Sabourin's report because it was based on an independent examination.  Id.

The opinion of a treating doctor generally should be given more weight than opinions of doctors who do not treat the claimant.  See Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222 (9th Cir. 2010) (citing Lester, 81 F.3d at 830-31).   If the treating doctor's opinion is not

---

[9] Although Plaintiff argues that the ALJ failed to give proper weight to Plaintiff's treating physicians in general, he cites only the opinions of Dr. Pham when making this argument.  See Pl.'s Mot. at 18-19; Pl.'s Reply at 3. Therefore, in this section of the discussion, the Court only addresses Plaintiff's argument in regards to Dr. Pham.  See Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1029 (9th Cir. 2001) (when considering motion for summary judgment, court need not consider evidence not "specifically referred to" in motion papers).  However, the Court notes that, as emphasized throughout this Report and Recommendation, and contrary to Plaintiff's allegations, the record as a whole indicates that the ALJ did in fact give sufficient weight to Plaintiff's treating physicians.

1   contradicted by another doctor, it may be rejected only for "clear and convincing" reasons

2   supported by substantial evidence in the record.  Id.  When the treating doctor's opinion is

3   contradicted by the opinion of another doctor, the ALJ may properly reject the treating doctor's

4   opinion only by providing "specific and legitimate reasons" supported by substantial evidence in

5   the record for doing so.  Id.  This can be done by "setting out a detailed and thorough summary

6   of the facts and conflicting clinical evidence, stating his interpretation thereof, and making

7   findings."  Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing Magallanes v.

8   Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  "The ALJ must do more than offer his conclusions.

9   He must set forth his own interpretations and explain why they, rather than the doctors', are

10  correct." Orn, 495 F.3d at 632 (quoting Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988)).

11  "The opinion of a non-examining physician cannot by itself constitute substantial evidence that

12  justifies the rejection of the opinion of either an examining physician or a treating physician; such

13  an opinion may serve as substantial evidence only when it is consistent with and supported by

14  other independent evidence in the record."  Townsend v. Colvin, 2013 WL 4501476, at *6 (C.D.

15  Cal. Aug. 22, 2013) (internal quotations omitted); Lester, 81 F.3d at 830-31; Morgan, 169 F.3d

16  at 600.

17      Here, Plaintiff does not identify the opinion provided by Dr. Pham which Plaintiff claims is

18  contradicted by Dr. Sabourin but merely references page 327 of the Administrative Record.  Pl.'s

19  Mot. at 18.  Page 327 is a referral dated July 1, 2011, from Dr. Pham to a UCSD neurologist, Dr.

20  Delaney[10], for diagnosis and treatment of migraine headache, left trigeminal neuralgia, chronic

21  neck pain and occipital neuralgia.  AR at 327.  The document does not contain a diagnosis by Dr.

22  Pham, nor does it contain an opinion about Plaintiff's medical condition.  Id.  Rather, it only is a

23  referral/request for Dr. Delaney to examine Plaintiff and determine if he has any of the listed

24  illnesses and if so, to treat them.  Id.  As such, Plaintiff has not identified an opinion by Dr. Pham

25  that was contradicted by Dr. Sabourin or rejected by the ALJ.

26      A review of the cited records fails to reveal significant and relevant contradictions between

27

28      [10] Plaintiff does not cite any treatment records or opinions from Dr. Delaney.  See Pl.'s Mot; Pl.'s Reply.

Drs. Pham and Sabourin.  <u>See</u> AR at 252-59; 295-99; 328-38.  Contrary to Plaintiff's claim, while Dr. Sabourin's examination primarily was orthopedic, he also included neurological findings. Specifically, Dr. Sabourin noted that Plaintiff had "normal motor strength throughout the upper and lower extremities bilaterally (5/5)," some decreased sensation in left leg and left arm, and mild deficiency in his left arm compared to his right arm.  <u>Id.</u> at 298.  Dr. Sabourin also concluded that Plaintiff's deep tendon reflexes were normal, that Plaintiff had "[n]o clonus, spasticity, or rigidity," and that Plaintiff's Babinski[11] and Hoffmann[12] tests were negative.  <u>Id.</u>  Based on his neurological examination of Plaintiff, Dr. Sabourin listed "[t]rigeminal neuralgia, status post trigeminal neuralgia surgery" as one of his impressions, and further indicated that Plaintiff's "problems appeared to be neurosurgical."  <u>Id.</u>  Similarly, Plaintiff's treating physician, Dr. Pham, diagnosed Plaintiff with trigeminal neuralgia and headache.  <u>Id.</u> at 254, 56, 258-59, 328-33, 338. As such, there does not appear to be a conflict between Dr. Sabourin's and Dr. Pham's neurological findings.

As set forth above, the cited record does not establish that Dr. Pham diagnosed Plaintiff with occipital neuralgia.  Even if the document did constitute a diagnosis, such diagnosis is insufficient to establish that Plaintiff's condition was severe, and thus does not create a conflict between Dr. Pham's and Dr. Sabourin's opinions with respect to the severity of Plaintiff's neurological condition.  <u>See</u> <u>Matthews</u>, 10 F.3d at 680 (mere existence of impairment is insufficient proof of disability for social security disability insurance benefits claim); <u>Lundell v. Colvin</u>, 553 F.App'x 681, 684 (9th Cir. 2014) (same).  Consequently, Plaintiff's argument that the ALJ erroneously relied on the finding of non-severe neurological impairments from non-treating and non-examining physicians, Dr. Jacobs and Dr. Haaland, who Plaintiff asserts "relied on Dr.

---

[11]   The Babinski reflex indicates "brain or nervous system disorder," including amyotrophic lateral sclerosis, brain tumor or injury, meningitis, multiple sclerosis, spinal cord injury, defect or tumor, and stroke.  <u>See</u> http://www.nlm.nih.gov/medlineplus/ency/article/003294.htm, last visited May 28, 2015; <u>see also</u> <u>Bailey v. Comm'r of Soc. Sec.</u>, 623 F. Supp. 2d 889, 892 n.9 (W.D. Mich. 2009) ("Babinski testing is designed to discern the presence of neurological damage in the brain and/or spinal cord.") (citation omitted).

[12]   The Hoffmann's test "is suggestive of spinal cord compression."  <u>Shiner v. Colvin</u>, 2014 WL 1767126, at *7 n.24 (M.D. Pa. May 2, 2014) (citing Hoffman Sign: Red Flag for Cervical Myelopathy, Orthopod, http://www.eorthopod.com/content/hoffmann-sign-red-flag-for-cervical-myelopathy).

Sabourin's finding of non-orthopedic disability but came to the conclusion of non-neurologic disability," also fails.  See Pl.'s Mot. at 19;  Pl.'s Reply at 6-7.  Both Dr. Jacobs and Dr. Haaland examined Plaintiff's medical records, including Dr. Pham's and Dr. Sabourin's diagnoses of trigeminal neuralgia, and Plaintiff's records from UCSD Medical Center, and concluded that Plaintiff's condition was non-severe.  See AR at 302-03, 312.

Based upon the Court's review of the record, the Court finds that Dr. Pham did not diagnose Plaintiff as having occipital neuralgia.  Even if the cited document did constitute a diagnosis, it does not contain an opinion regarding Plaintiff's limitations or pain.  Rather, the record supports the conclusion that the ALJ consulted the medical records from Plaintiff's treating physician, Dr. Pham, which contain diagnoses of trigeminal neuralgia, headache, hypertension and hearing loss, and made findings which closely resemble Dr. Pham's diagnoses by finding that Plaintiff's medically determinable impairments included "atypical left sided facial pain and headaches; trigeminal neuralgia, status post trigeminal neuralgia surgery; . . . hearing loss; . . . and hypertension."  Id. at 17, 252-64, 327-38.  Furthermore, the record does not contain any evidence indicating that Dr. Pham opined that Plaintiff had debilitating occipital neuralgia or any other severe limitation, which is consistent with the ALJ's finding of non-severe impairment or combination of impairments.  See id. at 252-59, 327-38; see also Ukolov, 420 F.3d at 1005-06.  Therefore, contrary to Plaintiff's assertions, the ALJ did not reject the opinion of Plaintiff's treating physician Dr. Pham.

**D.    Conclusion**

For the reasons set forth above, the Court finds that Plaintiff has not provided any evidence supporting his argument that a medical doctor opined that he had debilitating pain or other "severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement."  See 20 C.F.R. § 404.1520(a)(4)(ii).  The Court also finds that the ALJ provided proper, specific, clear and convincing reasons for rejecting Plaintiff's claims regarding the intensity, persistence, and limiting effects of his pain.  The Court finds that neither Dr. Pham nor Dr. Janese opined that Plaintiff had occipital neuralgia or severe pain or other impairments

32

1   and that neither of their opinions were improperly rejected by the ALJ.  The Court therefore

2   concludes that the ALJ's finding of non-severe impairment or combination of impairments at Step

3   Two of the sequential evaluation is supported by substantial evidence.  "The ALJ summarized the

4   claimant's background, subjective complaints, and medical evaluations," and, based on this

5   information, properly found Plaintiff not to be disabled.  See Seang Wang v. Astrue, 252 F. App'x

6   844, 846 (9th Cir. 2007).  The ALJ also provided citations to medical records and diagnostic tests,

7   which constitute "relevant evidence that, considering the entire record, a reasonable person might

8   accept as adequate to support a conclusion."  Lewis, 236 F.3d at 509; see also 20 C.F.R.

9   § 416.920 (burden is on claimant to prove disability).  The Court, therefore, **RECOMMENDS** that

10  Plaintiff's motion for summary judgment be **DENIED**.

11  **III.   Appeals Council Review**

12          Plaintiff argues that he submitted new evidence of his physical and mental impairments to

13  the Social Security Appeals Council ("AC"), and that the AC erred in rejecting the evidence.  Pl.'s

14  Mot. at 20-24; Pl.'s Reply at 7-10.  Defendant responds that the AC properly handled the newly

15  submitted evidence relating to the time period prior to Plaintiff's alleged onset of disability and

16  during the relevant time period and properly rejected the new evidence relating to examinations

17  and treatments occurring after the date of the ALJ's decision.  Def.'s Mot. at 18-22.

18          In a letter dated March 19, 2013, the AC denied Plaintiff's request to review the ALJ's ruling

19  after considering the additional evidence submitted by Plaintiff as follows:

20          We considered whether the Administrative Law Judge's action, findings, or
21          conclusion is contrary to the weight of the evidence of record.  We found that this
            information does not provide a basis for changing the Administrative Law Judge's
22          decision.

23          The Appeals Council considered additional evidence submitted in connection with
            the request for review consisting of medical records from Boris Khamishon, MD
            dated February 12, 2009 through February 19, 2009 (Exh. 16F consisting of 28
24          pages).  The Appeals Council also reviewed evidence from Dr. Khamishon and
            evidence from the University of CA (Exh. 17F, 5 pages and 18F, 45 pages).  This
25          evidence is dated prior to amended alleged onset date and is not material.

26          The Appeals Council reviewed additional evidence from Milton Lessner, PhD dated
            January 28, 2012 and evidence from Harry Henderson, MD dated February 4, 2012.
27          This evidence relates to the subsequent application currently [sic] pending in the
            hearing office and is contained in that record.  However, evidence submitted from
28          Don Edward Miller, PhD dated May 8, 2012 is not contained in the subsequent

application record, and is therefore, being returned to you. The Administrative Law Judge decided your case through December 5, 2011. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before December 5, 2011.

If you want us to consider whether you were disabled after December 5, 2011, you need to apply again. We are returning the evidence to you to use in your new claim currently pending at the hearing office.

AR at 2. Because the evidence that Plaintiff submitted to the AC concerns two distinct time periods, the Court will analyze them separately.

**A. Pre-ALJ's Decision Evidence** (AR at 345-421)

Plaintiff argues that the AC erred in rejecting Plaintiff's newly submitted medical records from his treating physician Dr. Khamishon and the UCSD Medical Center because they "are relevant to [his] claim of pain and neurological impairments." Pl.'s Mot. at 20-22; Pl.'s Reply at 7-9. Plaintiff also cites his prescriptions for Tylenol with Codeine #3, Vicodin, Cymbalta and Tegretol, and asserts that "the regime of painkiller narcotic and antidepressant medications," combined with his testimony of "suicidal ideation" as a result of pain, was substantial evidence of both mental and physical impairment to establish his alleged disability. Pl.'s Reply at 8-9. Plaintiff further argues that his UCSD neurologist, Dr. Alksne affirmed on October 18, 2010, that Plaintiff did physical therapy "without benefit," thereby undermining Defendant's claim that physical therapy was helpful. Id. at 8.

When new evidence is submitted for the first time on appeal, "[t]he Appeal Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). Review of the case is warranted only if the AC finds "that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." Id.

New evidence may provide a basis for remanding the case for further review, but "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Fryer v. Astrue, 2011

1    WL 717284, at *2 (C.D. Cal. Feb. 18, 2011) (quoting 42 U.S.C. § 405(g) (Sentence Six))[13]; Allen

2    v. Sec'y of Health & Human Servs., 726 F.2d 1470, 1473 (9th Cir. 1984)).  "New evidence is

3    material if (1) the evidence bears 'directly and substantially' on the matter in dispute, and

4    (2) there is a 'reasonable possibility' that the new evidence would have changed the outcome of

5    the administrative hearing."  Fryer, 2011 WL 717284, at *2 (citing Mayes v. Massanari, 276 F.3d

6    453, 462 (9th Cir. 2001); Booz v. Sec'y of Health & Human Servs., 734 F.2d 1378, 1380 (9th Cir.

7    1984) (new evidence is material if there is a reasonable possibility that it would have changed the

8    outcome of the ALJ's determination)).  In addition, evidence is new and material only where it

9    relates to the period on or before the date of the ALJ's decision. 20 C.F.R. § 404.970; Benveniste

10   v. Astrue, 2010 WL 3582208, at *3 (C.D. Cal. Sept. 9, 2010).  The good cause requirement is met

11   if there is new information that becomes available after the Commissioner's final decision and the

12   claimant could not have obtained the new evidence at the time of the administrative proceedings.

13   Pace v. Astrue, 2010 WL 3291753, at *2 (D. Or. June 28, 2010) (citing Key v. Heckler, 754 F.2d

14   1545, 1551 (9th Cir. 1985)).

15          After reviewing the potential new evidence submitted by Plaintiff, this Court finds that the

16   documents do not constitute new evidence because they duplicate information submitted to and

17   considered by the ALJ.  Further, as discussed in more detail below, the records are not material

18   and Plaintiff failed to establish good cause for his failure to include those records in his original

19   submission.

20          **1.    Duplicate Documents**

21          Many of the documents that Plaintiff submitted to the AC as new evidence were submitted

22   to the ALJ, and therefore are not new.  Those documents include: AR at 346, 351, 361-72, 374-

23   77, 380-90, 394, 396, 402-04, 406-08, 418, 420.  Although Plaintiff asserts that the "new"

24   evidence submitted to the AC establishes his history of treatment at UCSD for "severe" occipital

---

26          [13]   The statute provides in relevant part that "[t]he court may, on motion of the Commissioner of Social
27   Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to
     the Commissioner . . . and it may at any time order additional evidence to be taken before the Commissioner of Social
28   Security, but only upon a showing that there is new evidence which is material and that there is good cause for the
     failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g).

neuralgia, pain, and depression, the typed notes from Dr. Khamishon containing the occipital neuralgia diagnosis and the typed notes from the UCSD Medical Center and Dr. Khamishon detailing Plaintiff's treatment were previously submitted to and considered by the ALJ and do not qualify as new evidence. See id. at 239-50, 317-25; Pl.'s Mot. at 20-21; Pl.'s Reply at 7-9; see also AR at 18-19.  Additionally, the document cited by Plaintiff to support his assertion that Dr. Alksne "affirm[ed]" that Plaintiff did physical therapy "without benefit," was submitted to and considered by the ALJ, along with Plaintiff's reports that he was feeling better after undergoing physical therapy. See Pl.'s Reply at 8 (citing AR at 361); see also AR at 292, 339.  As such, the evidence is not new.

## 2. Prescriptions for Cymbalta and Tylenol with Codeine

The handwritten medical records[14] that Plaintiff submitted to the AC contain the following:

- Dr. Khamishon's prescription for *Cymbalta* on February 12, 2009, indicating that the medication was to be refilled no more than 3 times (AR at 348); a note as of March 12, 2009, indicating a prescription for Cymbalta (id. at 417); and a note as of March 24, 2010, indicating that Plaintiff "tried" Cymbalta (id. at 409).

- Notes indicating a prescription for *Tylenol with Codeine #3*[15] on January 8, 2009 (id. at 356, 399), February 12, 2009 (id. at 398), and March 12, 2009 (id. at 417), and March 25, 2010, indicating that Plaintiff "tried" Tylenol with Codeine #3 (id. at 409).

These records were not provided to the ALJ so the Court must determine whether the records were "material" and whether there is "good cause" for Plaintiff's failure to include the records in the original proceeding. Fryer, 2011 WL 717284, at *2.

Here, although Plaintiff was prescribed Cymbalta and Tylenol with Codeine #3 in early 2009, Plaintiff did not list these drugs among the medications that he was taking at the time of his admission for surgery in May 2009, thereby suggesting that the prescriptions were not

---

[14] With the exception of Dr. Khamishon's Cymbalta prescription (id. at 348), it is not entirely clear from the record which physician generated the notes, because the notes do not contain any signatures. See id. at 356, 398-99, 409, 417.

[15] "Codeine is an opioid pain medication. . . . Acetaminophen is a less potent pain reliever that increases the effects of codeine." http://www.drugs.com/mtm/tylenol-with-codeine-3.html (last visited May 28, 2015).

continued.   See AR at 245-46, 348, 356, 398-99, 409, 417.   Additionally, at Plaintiff's September 23, 2011 hearing, the ALJ discussed with Plaintiff and his attorney the prescription medications that Plaintiff was taking at the time and Plaintiff did not mention Cymbalta or Tylenol with Codeine #3, which also indicates that the prescriptions were not continued. See id. at 42-44; see also id. at 178, 199, 206 (containing Plaintiff's disability reports, which do not list the above medications).

Furthermore, because the record does not contain any evidence suggesting that Cymbalta or Tylenol with Codeine #3 were ineffective in treating Plaintiff's condition, the existence of the prescriptions is not sufficient to establish that Plaintiff's impairments or combination of impairments were severe. See Warre, 439 F.3d at 1006 ("[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."). Finally, the medications were prescribed before Plaintiff's May 2009 surgery and do not appear to have been continued after the surgery, which suggests that the surgery provided relief for Plaintiff's pain. See AR at 242-45, 348, 356, 398-99, 409, 417. Because the evidence of Cymbalta and Tylenol with Codeine #3 prescriptions does not bear "directly and substantially" on Plaintiff's alleged disability and there is no "reasonable possibility" that the documents would have changed the outcome of Plaintiff's administrative hearing, the evidence is not material.[16] See Fryer, 2011 WL 717284, at *2; Mayes, 276 F.3d at 462. Additionally, the notes evidencing the above-referenced prescriptions are dated in January, February and March 2009, well before Plaintiff's September 23, 2011 administrative hearing, and Plaintiff has failed to provide good cause as to why the documents could not have been obtained and provided to the ALJ at the time of the hearing. See AR at 26; Pace, 2010 WL 3291753, at *2; Key, 754 F.2d at 1551.

///

///

---

[16] To the extent that Plaintiff argues that his Cymbalta prescription is material because it establishes that he had a severe mental impairment [see Pl.'s Reply at 8-9], the argument fails because Cymbalta, by Plaintiff's own description, is used to treat depression, as well as other conditions, including pain. See id. at 8 n.10. There is no evidence in the record establishing that the medication was prescribed to treat Plaintiff's alleged mental impairment, and no evidence indicating that it was ineffective in treating Plaintiff's pain symptoms.

### 3.   Prescriptions for Vicodin and Tegretol

The handwritten notes that Plaintiff submitted to the AC also contain the following records:

- Notes indicating a prescription for *Vicodin* on June 12, 2008 (AR at 358, 401) and July 10, 2008 (id. at 357, 400), and a note as of March 24, 2010, indicating that Plaintiff "tried" Vicodin (id. at 409).

- Notes indicating a prescription for *Tegretol*[17] on April 16, 2009 (id. at 415), July 16, 2009, stating that "Teg[retol] still works" (id. at 416), December 17, 2009 (id. at 412), February 18, 2010 (id. at 411), March 18, 2010 (id. at 410), and June 17, 2010 (id. at 405).

Although these records are timely because they pertain to Plaintiff's medical condition prior to the ALJ's December 5, 2011 decision, they merely provide information that is cumulative of information already contained in the record and previously considered by the ALJ.  See id. at 335, 337 (containing Dr. Pham's notes indicating a prescription of Vicodin); id. at 42 (containing the ALJ's discussion of Plaintiff's Vicodin prescription); id. at 223 (containing Dr. Alksne's notes that Plaintiff reported a "marked improvement" after taking Tegretol); id. at 178, 199, 206, 211 (listing Carbamazepine among medications in Plaintiff's disability reports and in an application form filled out by Plaintiff); id. at 246 (listing Carbamazepine among medications taken by Plaintiff at the time of the admission for his May 2009 surgery); and id. at 295 (listing Carbamazepine in Plaintiff's medical history).  As such, the documents are not material.  See Fryer, 2011 WL 717284, at *2; Mayes, 276 F.3d at 462.  Furthermore, Plaintiff does not provide any explanation, let alone good cause, for not previously including this evidence in the record.  See Pl.'s Mot. & Pl.'s Reply; Pace, 2010 WL 3291753, at *2; Key, 754 F.2d at 1551.

///

///

///

---

[17] Tegretol (Carbamazepine) is an anticonvulsant, which decreases nerve impulses that cause seizures and pain and is "used to treat seizures and nerve pain such as trigeminal neuralgia." http://www.drugs.com/search.php?searchterm=tegretol (last visited May 28, 2015).

13cv1211-LAB (BLM)

### 4.    Other Handwritten Notes

The remaining handwritten notes contain Plaintiff's description of his symptoms, including frequent complaints of pain, indicate that he took Ginkgco Biloba herbs, which "work[ed] well" (AR at 356-58, 400-01), tried Imitrex (AR at 358, 398, 401), had occipital nerve injections, which "helped" (id. at 409-10), contain Plaintiff's reports that Tegretol helped with his pain (id. at 414, 416), and list various medications taken by Plaintiff (id. at 356-57, 398-99, 400, 405, 409-17). The notes also contain a referral from Dr. Khamishon for an "head MRI/MRA" on February 12, 2009. Id. at 397, 419.

Although the above documents address Plaintiff's condition on or before December 5, 2011, they are cumulative of the documents submitted to and considered by the ALJ. Further, the documents indicate that Plaintiff was prescribed various medications, received occipital nerve injections, and positively responded to the treatments. As such, it is not reasonably possible that these records would have changed the ALJ's finding that Plaintiff did not have a severe impairment, and thus do not constitute new material evidence. See id. at 15-21; Fryer, 2011 WL 717284, at *2; Mayes, 276 F.3d at 462. Additionally, these documents are all dated prior to Plaintiff's September 23, 2011 administrative hearing and Plaintiff fails to provide good cause as to why he did not submit the documents at that time. See Pace, 2010 WL 3291753, at *2; Key, 754 F.2d at 1551.

The Court therefore concludes that the AC did not err in finding that the pre-ALJ decision evidence submitted by Plaintiff in connection with his request for review was not material, and did not improperly disregard the evidence. Accordingly, Plaintiff is not entitled to relief on this claim of error.

### B.    Post-ALJ's Decision Evidence (ECF Nos. 35-2; 35-3; 35-4)

Plaintiff claims that the AC erred in rejecting the reports by Drs. Henderson, Lessner, Miller and Grisolia as not relevant to the period at issue, and asserts that the new reports would have established that Plaintiff had been suffering "from disabling neuroglial pain and mental illness well before the onset date." See Pl.'s Mot. at 22-23; Pl.'s Reply at 9-10. Specifically, Plaintiff argues that the evidence establishes that he has been suffering from severe pain and depression since

1    2002.  See Pl.'s Reply at 9-10.

2        When new evidence is submitted for the first time on appeal, "[t]he Appeal Council shall

3    evaluate the entire record including the new and material evidence submitted if it relates to the

4    period on or before the date of the administrative law judge hearing decision."   20 C.F.R.

5    § 404.970(b).  Review of the case is warranted only if the AC finds "that the administrative law

6    judge's action, findings, or conclusion is contrary to the weight of the evidence currently of

7    record."  Id.  Although these reports reference Plaintiff's medical history, they arise from

8    examinations and treatments occurring after the ALJ's December 5, 2011 decision, and they do

9    not contain any diagnoses establishing Plaintiff's disabling neurological or mental impairments

10   prior to December 5, 2011.  See Marci v. Chater, 93 F.3d 540, 544 (9th Cir. 1996) (medical

11   reports issued after the issuance of the ALJ's decision are less persuasive than those issued prior

12   to decision).

13       Dr. Henderson's report is dated February 4, 2012, and indicates that Dr. Henderson started

14   treating Plaintiff in December 2011 (the month of the ALJ's decision).  ECF No. 35-2 at 3.  Dr.

15   Lessner's report is dated January 28, 2012, and appears to report on tests and an examination

16   conducted on or about that date.  ECF No. 35-3 at 3.  Dr. Miller's report is dated May 8, 2012, and

17   states that Plaintiff was first seen in February 2012, and Dr. Grisolia's report[18] is dated April 28,

18   2012, months after the ALJ's December 2011 decision.  ECF No. 35-4 at 3-4.  Because the reports

19   are based on treatment that began after the ALJ's December 5, 2011 decision, the AC correctly

20   found that the new evidence did "not provide a basis for changing the Administrative Law Judge's

21   decision."  AR at 2; 20 C.F.R. § 404.970(b); Mayes, 276 F.3d at 463 ("[a] claimant does not meet

22   the good cause requirement [for submission of new evidence] by merely obtaining a more

23   favorable report once his or her claim has been denied."); 20 C.F.R. § 416.1476(b)(1).

24

25   [18] The Court notes that there is no evidence in the record indicating that Dr. Grisolia's report was submitted
26   to the AC for review.  Plaintiff provides as evidence of his submission of Dr. Grisolia's report to AC a letter from his
     counsel as of July 6, 2012 with a handwritten comment next to the typewritten text indicating the submission of Dr.
     Miller's report stating "including Dr. Grisolia's."  ECF No. 35-4 at 2.  However, the same letter from Plaintiff's counsel
27   is included in the record and does not contain the handwritten note indicating the submission of Dr. Grisolia's report
     (AR at 217), and Plaintiff does not point to any other evidence establishing that Dr. Grisolia's report was submitted
28   to the AC.

1  Furthermore, at the time of the AC's decision, the reports from Drs. Henderson and Lessner were

2  part of the administrative record and under review in Plaintiff's subsequent disability application,

3  and the AC permissively returned the remaining documents to Plaintiff.  See AR at 2; 20 C.F.R.

4  § 416.1476(b)(1) (providing that if a claimant "submit[s] evidence which does not relate to the

5  period on or before the date of the administrative law judge hearing decision, the Appeals Council

6  will return the additional evidence to [the claimant] with an explanation as to why it did not

7  accept the additional evidence and will advise [the claimant] of [his or her] right to file a new

8  application.).

9      For the reasons set forth above, the Court finds that the AC properly concluded that the

10 Plaintiff's post-hearing submission did not justify granting Plaintiff's request for review because

11 they did not demonstrate that the ALJ's decision was "contrary to the weight of the evidence

12 currently of record."  20 C.F.R. § 404.970(b).  In reaching this conclusion, the AC correctly

13 determined that the records created prior to December 11, 2011 were not material and that

14 Plaintiff had not established good cause for his failure to include these records in his original

15 submission.  With regard to the records created after the date of the ALJ's decision, the AC

16 properly determined that the records were not relevant to the issues before the ALJ as they did

17 not contain diagnoses relating to the relevant time period.  The Court therefore **RECOMMENDS**

18 that Plaintiff's motion for summary judgment on this basis be **DENIED**.

19                                    **CONCLUSION**

20     For the reasons set forth above, this Court **RECOMMENDS** that Plaintiff's Motion for

21 Summary Judgment be **DENIED** and Defendant's Cross-Motion for Summary Judgment be

22 **GRANTED**.

23     **IT IS HEREBY ORDERED** that any written objections to this Report and Recommendation

24 must be filed with the Court and served on all parties no later than **July 10, 2015**. The document

25 should be captioned "Objections to Report and Recommendation."

26     **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court

27 and served on all parties no later than **July 31, 2015**.  The parties are advised that failure to file

28 objections within the specified time may waive the right to raise those objections on appeal of the

1  Court's order.  <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d

2  1153, 1157 (9th Cir. 1991).

3       **IT IS SO ORDERED.**

4

5  DATED:  June 18, 2015

6

7                                  BARBARA L. MAJOR

8                                  United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13cv1211-LAB (BLM)